Not for Publication

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| CORINNE MYERS,<br><br>*Plaintiff*,<br><br>v.<br><br>ATLANTIC HEALTH SYSTEMS, *et al*,<br><br>*Defendants*. | Civil Action No. 13-4712<br><br>**OPINION** |

### John Michael Vazquez, U.S.D.J.

This matter comes before the Court by way of the motion for summary judgment filed by Defendants Atlantic Health Systems ("Atlantic"), Joseph Pasquarosa and Dorothy Zarillo (collectively "Defendants"). D.E. 108. Plaintiff Corinne Myers filed a brief in opposition (D.E. 118) to which Defendants replied (D.E. 121). The Court reviewed the submissions made in support and in opposition to the motion, and considered the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, Defendants' motion is **GRANTED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### 1. Factual Background[1]

During the relevant time period, Plaintiff was a part-time nurse on "J1," the surgical unit at Morristown Medical Center ("MMC"). MMC is owned by Atlantic. DSOMF ¶¶ 1, 8. As part of her duties, Plaintiff "routinely used an automated medication dispensing machine known as a Pyxis [] . . . , [to] access and withdraw medications." *Id.* ¶ 15. The Pyxis is a "computerized device that links electronic medical records to the dispensation of medicines." Plf's Cert. ¶ 14 n.1.

Atlantic's Pharmacy Department circulated automated monthly reports, called "Pandora Data Systems Anomalous Usage Reports," to department managers that showed nurses' Pyxis medication activity. DSOMF ¶ 18; *see also* Certification of Thomas Carlough, Pharm D ¶¶ 3-4, 6, D.E. 121-4 (explaining that he generated monthly reports). After receiving the October 2012 report, the J1 manager, Defendant Dorothy Zarillo, contacted Risk Management because she noticed that Plaintiff's use of Dilaudid, was "'significant' when compared to other nurses on the unit."[2] DSOMF ¶¶ 20-21. Zarillo's report was referred to security officer Manford Ayers, who created an incident report. *Id.* ¶¶ 21, 23. The incident report indicates that Human Resources

---

[1] The factual background is taken from the record, including the following sources: (1) Defendants' Statement of Undisputed Material Facts ("DSOMF"), D.E. 108-2; (2) the Certification of Steven F. Ritardi ("Ritardi Cert.") and supporting exhibits, D.E. 108-3 to -5; (3) Plaintiff's Counterstatement to DSOMF ("Plf's Counterstatement"), D.E. 117; and (4) Plaintiff's Certification Opposing Summary Judgment ("Plf's Cert."), D.E. 116.

[2] Dilaudid, a branded name for hydromorphone, is an opioid pain medication that is used to treat moderate to severe pain. *See* Dilaudid, https://www.drugs.com/dilaudid.html (last visited January 19, 2017).

2

representative Kathy Sortino was contacted, "briefed and agreed to [Plaintiff's] suspension, pending further investigation." *Id.* ¶ 24; Ritardi Cert. Ex. 13. As a result, on November 8, 2012, Ayers, Sortino, and an additional, unnamed security officer met with Plaintiff. Plaintiff was advised that Atlantic was investigating an issue with the Pyxis, and she was suspended while the investigation was pending. DSOMF ¶ 26.

The matter was referred to Atlantic's corporate investigations unit for further inquiry and was assigned to Defendant Joseph Pasquarosa. *Id.* ¶ 27. The end result of the investigation appears to be an internal confidential memorandum, dated November 13, 2012. DSOMF ¶ 29; Ritardi Cert. Ex. 17. The report concluded that there was insufficient information to "conclusively establish diversion," but that diversion was a possibility. As a result, the report recommended, among other things, further investigation by security. DSOMF ¶ 31. Pasquarosa then called Plaintiff and asked to meet with her on November 14, 2012. *Id.* ¶ 32. Due to Plaintiff's statements during the November 14 meeting, she was terminated. *Id.* ¶ 38.

The parties' have different accounts as to what occurred during the November 14 meeting. The parties do not dispute that Plaintiff voluntarily attended the meeting, which took place in Pasquarosa's office in the MMC security office. *Id.* ¶¶ 33-35; Plf's Cert. ¶ 18; Ritardi Cert. Ex. 4, 121:14-16. Plaintiff, Pasquarosa, Zarillo and at least one additional security officer were present. DSOMF ¶ 35; Plf's Cert. ¶ 18. The parties also do not dispute that during the meeting Plaintiff admitted to diverting drugs and signed a written statement admitting to the diversion. DSOMF ¶¶ 41-42; Plf's Cert. ¶¶ 19-20.

Plaintiff alleges that she was forced to falsely confess to diverting drugs at the November 14 meeting and participate in the Recovery and Monitoring Program ("RAMP"). At the time, she believed that if she did not do so, she would lose her nursing license, her job, and her pension.[3] Plf's Cert. ¶¶ 18-21. Plaintiff contends that she thought she could not leave the meeting until she made this false confession, testifying that Pasquarosa told her that she needed to sign the false confession before she left. *Id.*; Ritardi Cert. Ex. 20, 193:9-13. As a result, she "felt it to be understood that [she] could not leave." Ritardi Cert. Ex. 4, 166:1-18. Plaintiff also testified that during the meeting, there was a security officer standing behind her, between her and the door, and that during the meeting a second officer entered the office. Ritardi Cert. Ex. 20, 189:20-190:10. Plaintiff does not contend that anyone at the meeting physically touched her, restrained her from leaving, raised their voice, or verbally threatened her. Ritardi Cert. Ex. 4, 166:12-18. In addition, Plaintiff was not told that she was prohibited from leaving and did not fear for her safety at any point. *Id.*, 157:10-15. Finally, Plaintiff also testified that she was told that there were multiple police officers in the hallway who were prepared to arrest her, and that if she changed her statement to say that she was giving the drugs to other people she would receive a "lesser" punishment. *Id.*, 125:23-126:5; Plf's Counterstatement ¶ 18.

---

[3] Plaintiff also alleges that she did not understand that she was terminated when the meeting concluded. Rather, she believed that by agreeing to participate in RAMP, a voluntary treatment program that is run by the State Board of Nursing, she would be allowed to continue working at MMC upon completion of the RAMP program. Plf's Counterstatement ¶ 12. Plaintiff did not understand that she was terminated until she had a phone conversation with Sortino later in November 2012. *See* Ritardi Cert. Ex. 4, 156:1-10.

4

Defendants maintain that Plaintiff was terminated due to poor documentation and mismanagement of a controlled substance. DSOMF ¶ 38; Ritardi Cert. Ex. 29. Plaintiff, however, contends that she was terminated in retaliation for two whistleblowing activities.[4] DSOMF ¶ 68. The first incident involved the death of an elderly patient in late summer of 2012. Plaintiff alleges that she went to the patient's room to see if her assistance was needed because there was a "code, . . . meaning she was unresponsive." Plf's Cert. ¶ 8. Plaintiff states that when she got to the patient's room, nobody was attending to the patient, the doctor was on the phone discussing a DNR [Do Not Resuscitate order] with the patient's family, and the nurses were "standing around, waiting for orders." *Id.* After "a very long phone call," the family refused to authorize a DNR so the treating physician and nurses "began to attend to her and were able to get a pulse." *Id.* The patient was transferred to the ICU but allegedly died about twenty minutes later. *Id.* Plaintiff claims that she complained about this patient's care to three members of the nursing staff the day the incident occurred. *Id.* ¶ 9. Plaintiff also alleges that about a month later, in October 2012, she told educator Barbara Markt about the incident and that she wanted to report the incident. *Id.* ¶ 10.

The second incident concerned Plaintiff's refusal to work in "step-down." Step-down is "a category of beds on the [s]urgical floor reserved for people who had been moved out of ICU

---

[4] Defendants address two additional incidents that could potentially form the basis of a New Jersey Conscientious Employee Protection Act ("CEPA") claim; complaints regarding a change to the nurse to patient ratio and an anonymous letter criticizing Zarillo. *See* Defs' Br. at 14-15, 19. Plaintiff's opposition to the motion for summary judgment does not discuss these incidents in the context of her CEPA claim. The Court, therefore, will not construe these events as forming the basis of Plaintiff's CEPA claim.

5

[the intensive care unit], but who were not yet ready for the general [s]urgical floor." SAC ¶ 7. Plaintiff alleges that in September 2012, she refused an assignment to work in step-down because Plaintiff did not feel competent to work in the unit without prior training. Plf's Cert. ¶ 7. Plaintiff's refusal was allegedly reported to Zarillo, "who was angered by [her] refusal of the assignment." *Id.*

### 2. Procedural History

Plaintiff filed her complaint on August 6, 2013 and filed an amended complaint the following day. D.E. 1, 3. On October 18, 2013, Defendants filed a motion to dismiss, which was granted in part and denied in part.[5] D.E. 25. As a result, Plaintiff filed a second amended complaint on March 30, 2014 (the "SAC). D.E. 17. The SAC asserts (1) perceived disability claims under the Americans with Disabilities Act (the "ADA") and the New Jersey Law Against Discrimination (the "NJLAD") based on allegations that Defendants' perceived Plaintiff to be a drug addict; (2) wrongful termination claims under the New Jersey Conscientious Employee Protection Act ("CEPA") due to the alleged whistleblowing activities; and (3) tort claims for false imprisonment, defamation, intentional infliction of emotion distress ("IIED"), and negligent investigation. *Id.* After discovery was concluded, Defendants filed this motion for summary judgment on May 13, 2016. D.E. 108.

Defendants argue that Plaintiff does not establish the *prima facie* elements of a CEPA claim for either of the alleged whistleblowing events because she fails to identify a law, rule, regulation,

---

[5] In response to Defendants' motion to dismiss, Plaintiff filed a cross-motion seeking leave to amend. This motion was denied because the claim that Plaintiff sought to amend, a Section 1983 claim, was dismissed. D.E. 13.

or public policy that she reasonably believes Defendants violated. Defs' Br. at 8-13, 15-18. Defendants contend that even if the Court concludes that Plaintiff establishes a *prima facie* CEPA claim, she does not raise a genuine issue of material fact demonstrating that Defendants' legitimate, non-retaliatory reason for her termination, that she mismanaged and poorly documented her use of a controlled substance, was a pretext. *Id.* at 19-22. Defendants next argue that summary judgment should be granted for Plaintiff's ADA and NJLAD claims because "by her own admission, none of the defendants perceived or believed that she was a drug abuser." *Id.* at 24. As a result, Plaintiff fails to establish a *prima facie* perceived disability claim under either law. *Id.* at 22-28. Defendants also posit that Plaintiff cannot establish a claim for false imprisonment during the November 14 meeting because she cannot establish that she experienced a reasonable apprehension of the use of force to detain her. *Id.* at 28-30. As for Plaintiff's defamation claim, Defendants argue that summary judgment should be granted because she does not establish that Defendants' made any defamatory statements. *Id.* 30-33. Finally, Defendants posit that Plaintiff's claims for IIED and negligent investigation are waived pursuant to CEPA because they arise out of the same events that are involved in her CEPA claim. *Id.* at 36.

Plaintiff argues that her objections regarding the care that was provided to the elderly patient and her refusal to work in step-down violated several provisions of the American Nurses Association ("ANA") Code of Ethics and New Jersey public policy. Therefore, Plaintiff alleges that she was a whistleblower under CEPA. Plf's Br. at 6-7. Plaintiff also argues that summary judgment should be denied for her tort claims because there are material issues of fact. *Id.* at 7-9. Plaintiff, however, fails to specifically identify any disputed issues of material fact. Plaintiff does

7

not offer opposition to Defendants' arguments regarding her perceived disability claims or the CEPA waiver.

## II.   SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts

showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

### III. ANALYSIS

#### 1. CEPA Claim

Defendants argue that Plaintiff does not establish the *prima facie* elements of a CEPA claim because she fails to identify a law, rule, regulation, or public policy that she reasonably believes was violated. Defs' Br. at 8-13, 15-18. Plaintiff counters that both of the whistleblowing activities implicate various provisions of the ANA Code, and the care that was provided to the elderly patient violates New Jersey public policy. Plf's Br. at 6-7.

CEPA, N.J.S.A. 34:19-1, *et seq.*, permits a whistleblowing employee to bring suit against an employer that retaliated against her through an adverse employment action. *Winters v. N. Hudson Reg'l Fire & Rescue*, 212 N.J. 67, 89 (2012). Courts use the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to analyze CEPA claims. *Id.*

9

at 90. Thus, the employee carries the initial burden of establishing a *prima facie* case of retaliation. The burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). Next, the employee must establish that "the employer's reason was false and that retaliation was the real reason." *Id.* (quoting *Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 92 (3d Cir. 1999)) (internal quotation marks and brackets omitted).

To establish a *prima facie* case under CEPA, a plaintiff must show that: (1) she reasonably believed that her employer's conduct was violating a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) she performed a "whistleblowing" activity; (3) an adverse employment action was taken against her; and (4) a causal connection exists between the whistleblowing activity and the adverse employment action. *Brown v. City of Long Branch*, 380 F. App'x 235, 239 (3d Cir. 2010).

To satisfy the first element of a *prima facie* case, "a plaintiff must identify the authority that provides a standard against which the conduct of the defendant may be measured." *Tinio v. Saint Joseph Reg'l Med. Ctr.*, 645 F. App'x 173, 178 (3d Cir. 2016) (quoting *Hitesman v. Bridgeway, Inc.*, 218 N.J. 8, 31 (2014)). A licensed health care professional may satisfy this element by demonstrating that a defendant's conduct or policy "constitutes 'improper quality of patient care', that is, 'violates any law or any rule, regulation or declaratory ruling adopted pursuant to law, or any professional code of ethics.'" *Klein v. Univ. of Med. & Dentistry of N.J.*, 377 N.J. Super. 28, 42 (App. Div. 2005) (citing N.J.S.A. 34:19-3(c)(1), -2(f)). A plaintiff may also satisfy this standard by identifying "a clear mandate of public policy concerning the public health, safety,

10

or welfare." *Hitesman v. Bridgeway, Inc.*, 218 N.J. 8, 33 (2014) (citing N.J.S.A. 34:19-3(c)(3)). The clear public policy "must be clearly identified and firmly grounded." *Id.* at 34 (quoting *Mehlman v. Mobil Oil Corp.*, 153 N.J. 163, 181 (1993)); *see also Tinio*, 645 F. App'x at 178 ("In order for a substantial nexus to exist, the mandate of public policy "cannot be vague" and must "provide[ ] [a] standard by which . . . a deficiency can be ascertained.").

### a. The Elderly Patient Incident

Plaintiff contends that the ANA Code of Ethics supports her whistleblowing claim, arguing that in *Hitesman*, the court concluded that the ANA Code could be a sufficient source to support a CEPA claim.[6] Plf's Br. at 7. In *Hitesman*, a nurse brought a CEPA claim after he was allegedly terminated for voicing concerns about patients' rate of infectious diseases to the defendant employer's management. *Hitesman*, 219 N.J. at 14. The court, however, concluded that the ANA Code "does not constitute a source of law or other authority bearing a 'substantial nexus' to [Defendant's] conduct" because it did not govern defendant's patient care. *Id.* at 36. As a result, the plaintiff's CEPA claim failed as a matter of law. *Id.* at 15. Plaintiff's reliance on the ANA Code here is lacking for the same reasons. The ANA Code does not provide any general standards for obtaining a DNR or treating patients while a DNR is obtained, and it does not govern Atlantic's policies as to patient care. Thus, "it provides no standard under which a factfinder could determine whether plaintiff held an objectively reasonable belief that [Atlantic] delivered an 'improper quality of patient care.'" *Id.* at 37. In addition, the ANA Code does not represent a clear expression

---

[6] Plaintiff references three subsections of the ANA Code: (1) Section 1.4 – the patient's right to self-determination; (2) Section 2.1 – primacy of patient's interests; and (3) Section 3.5 – protection of patient health and safety. Plf's Br. at 7.

11

of public policy. *Id.* at 37 ("Nor does the ANA Code prescribe for [defendant] a 'readily discernible course of action that is recognized to be in the clear public interest,' from which we can discern a 'clear mandate of public policy.'").

Plaintiff also argues that "it is public policy of this state to care for hospital patients who have not given DNR orders[.]" Plf's Br. at 6. Plaintiff maintains that *In re Quinlan*, 70 N.J. 10 (1976), and *Betancourt v. Trinitas Hosp.*, 415 N.J. Super. 301 (App. Div. 2010), are the source of this public policy. *Quinlan* and *Betancourt* address the continuation of medical care for patients who are in a persistent vegetative state. *Quinlan*, 70 N.J. at 23-26; *Betancourt*, 415 N.J. Super. at 305. While *Quilan* and *Betancourt* do generally address patients' right to life neither discusses the parameters of DNR orders. Therefore, neither case is a sufficient expression of a clear public policy regarding procedures for obtaining a DNR or specific aspects of patient treatment. "[M]erely couching complaints in terms of a broad-brush allegation of a threat to patients' safety is insufficient to establish the first prong of a CEPA claim." *Klein*, 377 N.J. Super. at 42.

Therefore, Plaintiff fails to satisfy the first element of a CEPA claim with respect to this alleged whistleblowing incident.

### b. Refusal to Work in Step-Down

Plaintiff also alleges that her refusal to work in step-down is consistent with ANA Code 4.4, which addresses the assignment and delegation of nursing activities or tasks. Plf's Br. at 7. But again, as discussed, the ANA Code does not provide any standards for hospital staffing policies and does not represent a clear expression of public policy regarding nurse staffing. As a result, Plaintiff fails to satisfy the first element of a *prima facie* CEPA claim.

12

Because Plaintiff fails to establish the first element of a *prima facie* CEPA claim the Court need not address the remaining *prima facie* elements or Defendants' burden under the *McDonnell Douglas* framework.[7] Defendants' motion for summary judgment is granted as to the CEPA claim.

## 2. Perceived Disability Claims

Defendants argue that summary judgment should be granted for the perceived disability claims under the ADA and NJLAD because Plaintiff fails to establish that Atlantic believed she was a drug abuser. Defs' Br. at 22-25. Plaintiff does not address Defendants' arguments as to her ADA and NJLAD claims.

In the SAC, Plaintiff asserted perceived disability claims under the ADA, 42 U.S.C. § 12101, *et seq.*, and NJLAD, N.J.S.A. 10:5-2. "Both the ADA and the NJLAD afford protections to a person who does not have a disability, but is 'perceived as' or 'regarded as' having a disability." *Dennis v. County of Atlantic*, 863 F. Supp. 2d 372, 378 (D.N.J. 2012) (citing 42 U.S.C. § 12102(3)(A)). To prove either claim, a plaintiff must establish a *prima facie* case of discriminatory discharge by showing (1) she is disabled or perceived to have a disability; (2) she was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations; (3) she was fired; and (4) the employer sought someone else to perform the same work. *Id.*

---

[7] In addition, the Court notes that Plaintiff fails to provide evidence that creates a genuine issue of material fact as to whether either of the individual Defendants were even aware of Plaintiff's alleged whistleblowing activities. Plaintiff does not address either Defendants' knowledge regarding the elderly patient incident. And although Plaintiff alleges that Zarillo "was angered" by her refusal to work in step-down, Plaintiff testified that she does not know if her refusal was in fact reported to Zarillo. *See* Ritardi Cert. Ex. 4, 231:2-7.

13

A person may be regarded as disabled under the ADA even if they "have none of the impairments covered by the ADA" so long as she is perceived to have such an impairment. *Walker v. U.S. Sec. of the Air Force*, 7 F. Supp. 3d 438, 454 (D.N.J. 2014) (quoting *Buskirk v. Apollo Metals*, 307 F. 3d 160, 166 (3d Cir. 2002)) (internal brackets omitted). "[T]he regarded-as analysis 'focuses . . . on the reactions and perceptions of the persons interacting or working with him.'" *Id.* (quoting *Kelly v. Drexel Univ.*, 94 F.3d 102, 108-09 (3d Cir. 1996)). Thus, the relevant inquiry is whether the employer perceived the plaintiff "as disabled within the meaning of the ADA, not whether [plaintiff] was actually disabled." *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 434 (3d Cir. 2009) (citing *Capobianco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005)). To establish a perceived disability claim under the NJLAD, "the plaintiff must show that the employer entertained misperceptions about the plaintiff, . . . believing that the individual has a substantially limiting impairment that he or she does not have." *Incorvati v. Best Buy Co., Inc.*, No. 10-1939, 2010 WL 4807062, at *5 (D.N.J. Nov. 16, 2010) (quoting *Eckhaus v. Consol. Rail Corp.*, No. 00-5748, 2003 WL 23205042, at *9 (D.N.J. Dec. 24, 2003)).

Plaintiff alleges that Atlantic perceived her as having a substance abuse problem. A drug addiction may constitute a disability. *Skinner v. City of Amsterdam*, 824 F. Supp. 2d 317, 330 (N.D.N.Y. 2010); *In re Cahill*, 245 N.J. Super. 397, 400 (App. Div. 1991). Plaintiff, however, fails to provide evidence establishing that Atlantic actually thought that she had such a problem. Rather, through her deposition testimony, "Plaintiff tacitly . . . concedes" that her allegations have no merit. Defs' Br. at 25; *see, e.g.*, Ritardi Cert. Ex. 4, 179:22-180:7 ("I believe that I was terminated out of revenge and that did they – do I feel like they truly thought I was a drug addict,

no."); *id.* 125:23-126:5 ("He said . . . not one of them felt or was convinced as well as himself that I was a drug addict using drug, abusing drugs . . . ."); Ritardi Cert. Ex. 20, 182:7-12. Because Plaintiff does not provide facts upon which a reasonable jury could conclude that Atlantic perceived her to be disabled, she does not set forth a *prima facie* claim under the ADA or NJLAD. Summary judgment, therefore, is granted to Defendants for Plaintiff's claims under the ADA and NJLAD.

### 3. False Imprisonment

Defendants argue that Plaintiff fails to establish that she experienced a reasonable apprehension of force such that summary judgment should be granted as to Plaintiff's claim for false imprisonment. Defs' Br. at 28-30. In response, Plaintiff contends that summary judgment should be denied because there are numerous issues of fact. Plf's Br. at 7-8.

"A person is falsely imprisoned when that person's freedom of movement is constrained." *Maietta v. United Parcel Serv., Inc.*, 749 F. Supp. 1344, 1367 (D.N.J. 1990). The tort of false imprisonment has two elements: (1) detention of the person against her will; and (2) lack of proper legal authority or legal justification. *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 591 (2009). Detention "may be effectuated by force or by threats of force communicated through conduct or words." *Maietta*, 749 F. Supp. at 1367. Threats of force "must be such as would 'induce a reasonable apprehension of force, and the means of coercion must be at hand.'" *Id.* (quoting *Earl v. Winne*, 14 N.J. 119, 127 (1953)).

Plaintiff does not allege that anyone physically touched or prevented her from leaving the November 14 meeting. Therefore, Plaintiff's claim hinges on whether Defendants' words or

15

conduct created a reasonable apprehension that force would be used to restrain her. Plaintiff testified that she was never told she could not get up from her chair or leave the meeting. Ritardi Cert. Ex. 4, 157:10-15. In addition, Plaintiff does not allege that anyone raised their voice or verbally threatened her. *Id.*, 166:12-18. Plaintiff, however, "felt it to be understood that [she] could not leave," and Pasquarosa told her that she needed to sign the false confession before she left. *Id.*, 166:1-18. Plaintiff also testified that there was a security officer standing behind her, a second officer entered the office during the meeting, and police officers were waiting in the hallway.[8] *Id.*, 189:20-190:10.

Giving credence to Plaintiff's version at this stage, she clearly felt pressure to stay. However, there is not a genuine issue of material fact as to whether there was a threat of force. The record is devoid of facts demonstrating that Plaintiff feared for her safety or believed that Defendants would physically prevent her from leaving the meeting. *See, e.g., Maietta*, 749 F. Supp. at 1367 (granting summary judgment to defendant for false imprisonment claim where plaintiff was never told he could not leave the room, did not request to leave or fear for his safety, and defendants did not scream, yell, or verbally threaten him). At best, the facts demonstrate that Plaintiff felt internally compelled to stay and sign the confession in order to keep her job. The threat of losing a job, however, does not constitute a threat of force. *See Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 334 (D.N.J. 2005); *see also Leang*, 198 N.J. at 591 (concluding that Plaintiff was not falsely imprisoned where she voluntarily went to office and chose to remain

---

[8] Plaintiff's allegation as to the police officers is a red herring. Plaintiff does not allege that she believed that the police officers would use force to keep her in Pasquarosa's office. Instead, she infers that the officers were waiting to arrest her.

16

in order to better her chances of being rehired). Consequently, Defendants' motion for summary judgment is granted as to this claim.

### 4. Defamation

Defendants argue that summary judgment should be granted for Plaintiff's defamation claim because Plaintiff fails to identify the source of the alleged defamatory statement and because the alleged statement was true. Defs' Br. at 31-32. Plaintiff again responds that there are jury questions such that summary judgment should be denied. Plf's Br. at 9.

To prove defamation, a plaintiff must establish that the defendant made a defamatory statement of fact concerning the plaintiff that was false and communicated to a person other than the plaintiff. A plaintiff must also establish fault. *Govito v. W. Jersey Health Sys., Inc.*, 332 N.J. Super. 293, 305 (App. Div. 2000) (citing *Feggans v. Billington*, 291 N.J. Super. 382, 390-91 (App. Div. 1996)). Statements that are substantially true are not defamatory. *Taylor v. Amcor Flexibles Inc.*, 669 F. Supp. 2d 501, 513 (D.N.J. 2009). Here, Plaintiff alleges that "[b]y falsely accusing Plaintiff of drug diversion and/or substance abuse, and by staining her professional record with her designation for RAMP, Defendants have libeled and slandered her, and damaged her personal and professional reputation." SAC ¶ 30. Plaintiff does not identify any specific defamatory statements in her complaint, but testified in her deposition that a man from an employment agency based in New York brought up her lawsuit and that it had something to do with drug diversion. Ritardi Cert. Ex. 20, 26:13-28:24; 30:10-31:9. Plaintiff, however, does not know how the employment agency learned of the lawsuit and provides no evidence suggesting that Defendants communicated this information to the unnamed employment agency. *Id.*, 27:22-24. Moreover, Plaintiff initially

17

made information about her alleged drug diversion public by filing this lawsuit. As a result, to the extent this unnamed agency learned about the lawsuit by reading Plaintiff's complaint, it does not constitute an actionable statement because it was made by Plaintiff, not Defendants. If, however, the agency learned about the lawsuit by reading Defendants' answer or other document related to this litigation it is barred by the doctrine of judicial immunity. "A statement made in the course of judicial . . . proceedings is absolutely privileged and wholly immune from liability." *Kidd v. Sup. Nursing Care, Inc.*, No. 08-504, 2008 WL 2945960, at *2 (D.N.J. July 28, 2008) (quoting *Erickson v. Marsh & McLennan Co.*, 117 N.J. 539, 563 (1990)). As a result, Plaintiff's defamation claim fails with regard to any statement involving the employment agency.

Plaintiff also testified that her defamation claim is premised on the fact that Atlantic was not returning reference calls from potential employers and that employers are able to find out that she participated in RAMP. Ritardi Cert. Ex. 20, 29:3-23; 31:10-18. These allegations, however, do not involve any affirmative statements that were made by Defendants. Thus, Plaintiff's defamation claim fails and summary judgment is granted to Defendants.

### 5. Intentional Infliction of Emotional Distress and Negligent Investigation

Defendants argue that by asserting a CEPA claim, Plaintiff waived her right to bring the intentional infliction of emotional distress ("IIED") and negligent investigation claims. Defs' Br. at 33-37. Plaintiff does not address Defendants' arguments as to waiver.

"[O]nce a CEPA claim is 'instituted,' any rights or claims for retaliatory discharge based on a contract of employment; collective bargaining agreement; State law . . . ; or regulations or decisions based on statutory authority, are all waived." *Young v. Schering Corp.*, 141 N.J. 16, 29

(1995). Causes of action that fall into this waiver provision are those that "are directly related to the employee's termination due to disclosure of the employer's wrongdoing." *Ivan v. County of Middlesex*, 595 F. Supp. 2d 425, 465 (D.N.J. 2009) (quoting *Falco v. Cmty. Med. Ctr.*, 296 N.J. Super. 298, 318 (App. Div. 1997)). Causes of action that are "substantially independent" are not waived. *Id.* In this instance, Plaintiff alleges that she suffers severe emotional distress because "Defendants were reckless and negligent in their accusations that Plaintiff had either diverted Dilaudid or consumed it personally." SAC ¶¶ 32-35. Similarly, Plaintiff alleges that Defendants breached their duty to exercise reasonable care and thoroughness when investigating the alleged diversion of controlled substances. *Id.* ¶¶ 36-39. These allegations are directly relevant to Plaintiff's CEPA claim; specifically, they pertain to Defendants' burden to establish a legitimate, nondiscriminatory reason for Plaintiff's termination. The fact that the Court did not actually reach this issue does not matter because the CEPA complaint was actually litigated and decided on the merits. Thus, the IIED and negligent investigation claims are barred.[9] *See, e.g., Falco*, 296 N.J. Super. at 317-18 (affirming dismissal of related state law claim as preempted due to decision on the merits for CEPA claim); *Urbanski v. Township of Edison*, No. A-2129-12T2, 2014 WL

---

[9] Even if it were not barred, summary judgment would be granted as to Plaintiff's negligent investigation claim because such a cause of action does not exist under New Jersey law. *See Campbell v. Supreme Court of New Jersey*, No. 11-555, 2012 WL 1033308, at *3 n.5 (D.N.J. Mar. 27, 2012) ("[T]his Court concludes that New Jersey law does not recognize 'negligent investigation' as an independent cause of cause."). Summary judgment would also be granted for Plaintiff's IIED claim because Plaintiff does not establish facts upon which a jury could conclude that Defendants' actions were "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Buckley v. Trenton Saving Fund Soc.*, 111 N.J. 355, 366 (1988).

19

183966, at *7 (App. Div. Jan. 17, 2014) (concluding that IIED claim was barred even though CEPA claim was dismissed at summary judgment).

## IV.   CONCLUSION

For the foregoing reasons and for good cause shown, Defendants' motion for summary judgment (D.E. 108) is **GRANTED.** An appropriate form of order accompanies this opinion.

Dated: January 20, 2017

John Michael Vazquez, U.S.D.J.